Case No. 18-1007, et al., AT&T Corp. petitioner v. Federal Communications Commission and United States of America. Mr. Troop for petitioner, Iowa Network Services, Inc. Mr. Garrett for petitioner, AT&T Corp. Mr. Scherr for the respondent. Good morning, gentlemen. Mr. Troop, you may proceed. Thank you, Your Honor. May it please the Court. My name is James Troop. I represent petitioner, Iowa Network Services, doing business as Orion. Orion is a small rural telephone company that more than 30 years ago and over that 30-year period constructed 2,700 miles of fiber optic cable to concentrate the traffic of 200 rural telephone companies at a single location in Des Moines, Iowa, where long-distance carriers like AT&T and Sprint can connect in order to efficiently and economically serve customers located in thousands of rural areas. This is a filed rate doctrine case and tariff enforcement action seeking AT&T's payment of the FCC tariff rate that was filed, effective, and deemed lawful between 2013 and 2018. This case will also impact how Orion's tariff rates are regulated in the future, whether it be Rule 61.38, cost-based regulation that has applied to Orion for more than 30 years, or the new dual incumbent carrier competitive carrier rule that the FCC has never applied to anybody until this order under review. Those incumbent carrier rules and the competitive carrier rules have always been treated mutually exclusive by the FCC and the industry. According to the text in the headings, those rules are mutually exclusive and differ between dominant carriers and non-dominant carriers. The key to this case is the lack of forbearance. Congress, in Section 10 of the Communications Act, provided a three-part test for the FCC to forbear from the tariff requirements if it met that test. The FCC has never applied that test to Orion's rates, and forbearance from the statute has never been applied to Orion's rates. The FCC continues to apply all of its tariff rates rules and cost-based rate rules to Orion. The FCC relies heavily on the Connect America order, also known as the Transformation Order, 26 FCC records, 17663. However, instead of forbearance, Paragraph 687 of that order explicitly prohibited Rule 61.38 carriers like Orion from using rate ceilings to calculate its tariff rates. That paragraph states that the FCC declines the proposal that a, quote, Section 61.38 carrier be allowed to benchmark to the BOC rate, end quote. Yet, the order under review required Orion to benchmark to century-length rates, even though Orion is a Rule 61.38 carrier. Orion's tariff rates are now more highly regulated than even AT&T's rates for switched-access service. Given the lack of forbearance, the FCC must comply fully with the governing statute, the Communications Act, without the exceptions the FCC imposed in this case. Notably, the FCC's decisions and briefs do not rely on forbearance, but instead argue that Orion's filed and effective 2013 tariff rate was not legal. In Arizona grocery, the Supreme Court identified only two requirements for a rate to be legal. The rate is filed. Mr. Troop, this is Judge Sadle. Let me just interrupt you and ask you an antecedent question here about Section 51.903. Your position is that your client is not a COEC under that rule, right? Correct. But I'm not sure. I mean, because if you're right about that, that ends this case, so let's focus on that. Your client provides exchange service, right? Correct. And it's not an ILEC, right? So why isn't it a COEC under the plain language of that rule? Well, for 30 years, the FCC... No, no. Why isn't it a COEC under the plain language of that rule? That's an operative rule now. The rule, the transformation order of the rule does not apply to Rule 61.38, carriers that are dominant carriers. It has an exception. 51.905C says that nothing in this section shall be construed to require a carrier to file or maintain a tariff or to amend an existing tariff if it is not otherwise required to do so under applicable law. Applicable law for Orion has been 61.38, cost-based regulation since its inception. I'd like to reserve five minutes for rebuttal. How does 905C qualify the plain language of the definitional section Judge Tatel asked you about, which says plain as day, any LEC that's not an ILEC is a CLEC? Because there are other carriers other than ILECs and CLECs, the FCC has imposed ILEC rules on Orion for over 30 years. And they are mutually exclusive from the CLEC rules. And the CLEC rules, when you look at them, like 51.911, cross-reference 61.26, which is entitled Rules for Non-Dominant Carriers, and Orion has always been a dominant carrier. They have imposed on you whatever obligations flow from being a dominant carrier under whatever scheme governs dominant carriers, but this one is keyed to a distinction between competitive and incumbent. Well, 61.38, which Orion has been regulated under, is only applicable to incumbents. It's not just a distinction between dominant carriers and non-dominant carriers. 51.38 carriers are only incumbents. And the rules that have been applied, Part 32, cross-accounting, the FCC has asked for a waiver of that rule. It said if you're classifying as a competitive carrier, you should waive that rule. The FCC declined to waive that rule just a few months ago. They are applying in the second tariff order, they've applied all the incumbent rules, which do not apply if you're a competitive carrier. You can't be both. You can't be a subject to incumbent carrier rules and competitive carrier rules. But the rule classifies Orion as a CLEC only for purposes of the transitional pricing rules. That's all. So what about those rules are mutually exclusive with other regulations about dominant carriers? That's the argument you have to prevail on, that argument to succeed here. If I understand, the incumbent rules and the competitive carrier rules are mutually exclusive. And in this case, the FCC is applying all of those rules to Orion. They have never done that ever in the history. They never explained this dual regulation. Parts 32, 36, 69, 61 are all applicable to only incumbents. Orion is wholly owned by an incumbent. The industry has always thought that if Orion would be regulated, be more regulated as an incumbent than on the rate ceilings. Because the competitive carrier rate ceilings, the purpose of them is to replace cost-based rate regulation. And Orion is still required to file tariff rates based on costs. So it can't be a competitive carrier because competitive carrier's rate ceilings are intended to replace cost-based regulation. Mr. Troop, I just want to quickly change subjects on you and ask you about the interest rate issue. If we don't agree with you, and we think that the transitional rules do apply to your client, do I read your brief correctly that you're not challenging the commission's conclusion that the interest rate rates violated the regulations? You're not challenging those, are you? Assuming the transitional rules apply. Assuming the transitional rules apply and they qualify as a proper rate prescription under Section 205, under 205, the FCC would have to find that the rates that Orion had in 2013 were not just and reasonable, but they imposed a rate ceiling in 2011 before that rate was filed. And the rate ceilings themselves would have to be just and reasonable, and the FCC has not allowed Orion to build the rate ceilings. Twice we've been required to file rates below the rate ceilings. So those rate ceilings cannot be just and reasonable. If they're not just and reasonable for interstate, the FCC can't have the power. Tell me, where do you make that argument in your brief? I thought your argument about the interest rate rates was basically you weren't subject to the transitional rules. But where did you make that argument? Just a minute. Where did you challenge the commission's decision that the interest rate rates were unlawful? You may have. I just don't recall. Where was it? In the reply on reconsideration of the referral order, now under review, Orion indicated that if a rate ceiling is just and reasonable under 201- You're referring to before the commission, right? Yeah, JA-429. I'm talking about in this court, in your brief in this court. Oh, in this court? Yeah. Well, I don't have the slides right in front of me, but we've argued over and over again that the rate ceilings do not recover costs. Maybe when you stand up for rebuttal, you'll just give me the site in the brief. I will. Okay. Thank you. Judge Katz, Judge Griffith, do you have any other questions before we move on? I do not. Okay. No. Mr. Guerra? Good morning, Your Honor. May it please the court, Joe Guerra for AT&T. I'd like to focus primarily on two issues this morning, the FCC's conclusion that AT&T waived its right to collect full damages and also the proper interpretation of the deemed lawful provision. The commission's waiver ruling essentially violated AT&T's right to bifurcate liability and damages issues. Having made that election, AT&T's only burden in this case, in the liability phase of this case, was to establish that Orient's 2013 rate was illegal, and AT&T indisputably did that. It had no burden to... Mr. Guerra, Judge Griffith, can I ask you a preliminary question? Sure. Isn't it significant that the CLEC bill and HEAP rule has no interstate rate cap? I mean, it mentions it in the rule's preamble, but shouldn't the plain text prevail over the preamble? Your Honor, I don't think it is significant, and I don't think it's just the preamble. I mean, I think the paragraph, I think it's 799, is as plain as a prescription as you can get. It says all interstate rates are capped. The scope of a rule under the Administrative Procedure Act can include operative language, such as the language I just mentioned, from the explanation for the rule, and I think in this case that's clearly part of the actual rule, and the FCC has taken that position as well, and I think their view is entitled to deference in this circumstance. But if you're wrong about that, I mean, we have case law that says preamble language doesn't, and I think the Commission does, too. If you're wrong with that, then doesn't that take care of the interstate rate issue? I don't believe so, Your Honor. Well, our principal view is that we are correct about that, obviously, but... No, no, I think that's where... Right. If you're wrong about it, doesn't that take care of the interstate? I don't think so, Your Honor, because other aspects of the actual rules relate how you calculate the intrastate rates to the interstate rates, and if you conclude that the absence of an explicit interstate rate in the rules themselves is fatal to an interstate rate cap, then that makes a hash of the entire regulatory scheme, and I think for that reason, you are... Essentially, I think it requires that the Court take the position that 51-911C, in fact... 51-911, in fact, includes an interstate component. Well, but hang on. Let's be a little more precise, because there were separate claims made under 911A, B, and C. The Commission didn't reach the claim under C. Let's talk about the one, the claim under A. That language, by its terms, prohibits a rate increase for intrastate service above the rate in effect in 2011. That is, plain as day, limited to intrastates. How do we construe that provision to cover interstate, or are you relying on a different provision? We're relying on the paragraph and the chart in the... Let's talk about the CFR for now. What provision in 47 CFR Part 51 can we construe to cover that violation the FCC found about the 2013 filing for interstate rates? Your Honor, I don't... The excerpts that I have in front of me, I apologize, don't include, but I know that there is a reference to the chart in the transformation order that's in the... I think it's 51-905. It refers to the chart in the transformation order itself, and so I think that incorporates, by reference, if you're not going to accept our interpretation of the order itself as binding, I think that cross-reference is sufficient, particularly because then you have a huge gap in a rule that's supposed to govern all interstate carrier rates. And this is part of a 10-year-old transformation of the entire intercarrier compensation scheme, and that would be a significant hole in that rule. Well, it might be a minor hole. You would still have an argument that C, which is 911C, which is not limited to intrastate rates, kicks in as of 2013. Your Honor, 911C is incorporating the SELEC benchmark rules. That's different from the CAHPS. It's a different kind of CAHPS, and so I don't think 911C is the direct source. Obviously, I'll defer if Mr. Scherer has a different view on this subject, but my understanding is that 911C subjects Oren and all other SELECs to the benchmarking rules under 6126 as of July 1, 2013. So the cap, the interstate rate cap, and as you know, that really gets to my waiver point, if I could get back to that in just a second, but the interstate cap itself, I think, is under the definition, again, under the Administrative Procedure Act definition, I think that that flat capping of rates is an actual legislative rule. If I could return, Your Honor, to the waiver point, and the SELEC benchmarking rule really gets to the essence of this point, to the extent the FCC properly revived the 2012 rate, it did so as the measure of AT&T's damages, as the rate Oren should have charged instead of its unlawful 2013 rate, which is what Oren asked for in its petition for reconsideration. Because the 2012 rate was relevant only as a measure of damages, its validity did not have to be determined in the liability phase. Instead, AT&T had the right and should still have the right to show in the damages phase that the 2012 rate could not be the rate that should have been charged. Even if it was lawful when filed in 2012, even if it was deemed lawful shortly thereafter, it was not lawful forever. Because if it exceeded the SELEC benchmark rate on or after July 2013, then it was de-tariffed by operation of law and void and unenforceable. And there's a fundamental logical inconsistency in the FCC's reasoning here because it says that AT&T can challenge the validity of the 2012 rate if it's based on furtive concealment, which is just another way of saying that the 2012 rate is invalid. They can do that in the damages phase, but for some reason that they haven't explained, they can't challenge it under the SELEC benchmarking rules, which just is irrational distinction. And in addition, Your Honor, the FCC hasn't adequately explained why waiver principles should trump its responsibility to enforce those SELEC benchmark rules. Again, if the rate exceeded the SELEC benchmark as of July 2013, then it's void and unenforceable. And the FCC hasn't explained why a procedural footfall, and I don't agree that there was one, makes it okay to enforce a rate that's unlawful or void. It hasn't said that the interest of finality or need to prevent undue prejudice to orient justifies not caring about whether or not the rate is illegal. All it said is you should have seen this coming. And as we pointed out in our papers, that's wrong because, A, they cite no precedent in which any complainant has been required to challenge rates in a complaint-parsing phase that may be revived as a measure of damages. And even if AT&T should have seen that the rate might be revived as a measure of damages, that simply meant that it should have been unnoticed that it would have to challenge that rate in the damages phase, not as part of the liability proceedings. If I could just turn to the deemed lawful provision itself. Orrin is asking this court to read a single sentence in that provision entirely out of context and to ignore the structure of the statute, in particular Section 205A. That provision empowers the FCC to prescribe just and reasonable rates to be thereafter observed, and those descriptions have the force of a statute. Congress surely knew this in 1996, and yet it did not amend 205A in any way when it added 204A3 to the statute. In light of this, you would need very strong evidence to justify the counterintuitive, if not implausible, conclusion that Congress thought that rates the FCC has already prohibited should be eligible for deemed lawful status, and there is no such evidence here. Orrin focuses... Isn't it inherent in a deemed lawful formulation that there will be rates that would otherwise be unlawful but are treated as lawful by operation of this provision? Your Honor, the point of the provision was to address the situation that arose in the ACS case. You have circumstances where people file rates under rate-of-return regulations, and you can't know, as this court said, it's virtually impossible to tell whether they're going to be found to be reasonable or not for months, if not years. And this provision shifted the risk of that uncertainty from carriers who previously were subject to refund liability over to customers, and said, from now on, if you don't object quickly, there's no refund right. But there's no evidence that Congress meant to shift the risk of illegal filings from the likes to the customers, and that's what they're arguing for here. And if I could just point out, Your Honor, even the sentence that they are focusing on says that if the FCC decides to take action, the action it's supposed to take under subsection A-1 is to enter upon a hearing concerning the lawfulness of the rate. It makes no sense to hold a hearing to decide whether a rate you already outlawed is lawful. And that incongruity just points out that Congress could not have anticipated this kind of situation when it adopted the deemed lawful provision. What it was really aimed at was the circumstance I just described, where you wouldn't necessarily know whether the rate was... Your theory is that this operates only if the substantive rules governing the rate, if it's unclear, if it's sufficiently unclear how those rules apply to the filing at the moment of the filing. Your Honor, I don't know that... That makes some intuitive sense, but I just don't see it in the text of 204-A-3. Your Honor, I think what you need to find in the text of 204-A-3 is that Congress authorized the filing of rates that have been proscribed by the FCC in advance that have the force of a statute, and you have to reconcile. I think this is a question of reconciling the tension between two provisions. That's fine, but, I mean, the statute itself, without any action by the FCC, proscribes unjust and unreasonable rates. But, Your Honor... It's the same thing about the statute, right? Once someone figures out that the rate is unjust and unlawful, you could say, well, it was made that way by the statute from the moment of the filing. Or suppose the FCC, you put a lot of weight on their promulgating regulation, suppose they just promulgate a regulation that says no rate shall be unjust or unreasonable. Your argument would apply equally to that regulation as to the rules we're talking about here. I don't think so, Your Honor. That would just be a restatement of the statutory standard. But the issue with the statutory standard is you cannot, this is what you said in the ACF case, you cannot know at the time of the filing whether the rate is unlawful. And that uncertainty is what 2048... Right. So the key point on your theory is not that there's a pre-existing regulation, it's that it's hard to figure out how that regulation applies to the filing at issue. Your Honor, what we're saying is that when the FCC has proscribed rates and said no rates above X, that's not just, that's not a regulation, that is a prescription of rates above X that has the force of a statute. There's no ambiguity, there's no reason, there's no uncertainty as to whether or not the rates that exceed that level are reasonable anymore. They are per se unreasonable. And that's the only circumstance we're saying, again, because you have to resolve the tension between these two provisions, that you cannot plausibly conclude that Congress intended to allow carriers to file rates that have already been outlawed as per se unreasonable. And that's... There's no evidence in the legislative history Congress intended that. The single sentence that says you may file does not contain the kind of evidence you would need to justify that conclusion. In the CSX case, by contrast, you had a statute that said that the carrier could file any new rate and then proscribed one exception, leaving the conclusion that, aside from that one exception, even unlawful rates could be filed. You don't have that here. And so in light of that, we're saying as a matter of holistic statutory interpretation, you have to read these pieces of parts together to conclude that Congress did not authorize and did not consider already unlawful rates to be eligible for deemed lawful status and just sort of create the exercise of having to put people on if-you-can-catch-me-if-you-can kind of filing requirement in which if somebody gets away with it, suddenly a rate... They're effectively amending a rate prescription by the FCC. Mr. Garrett, this is Judge Griffith. Let me back up a little bit and ask a broader question. If we disagree with you on the applicability of the interstate rate cap, if we conclude that it doesn't apply to CLEC here, why should we reach any of the damages issues, including the deemed lawful issue? Well, Your Honor, I think in that circumstance, AT&T should have the right to demonstrate that the rate as of 2013 violated the CLEC benchmark rule then. There's no question that that rule applied as of 2013, and that would have been an issue that... I think the FCC, in fact, said that it was not going to address it in light of its conclusion that there was a rate cap violation that didn't need to address it, but they should not get off scot-free if you conclude that there's no interstate rate cap. If their rate exceeded the 2013 CLEC benchmark rule, then it was void and unenforceable as of that date, and so we would have a remand, I think, to assess that question. Okay, thank you. So we're way over time here. Judge Cassis, do you have any other questions? No, I'm fine, thank you. Okay, let's go ahead and hear from the Commission, and Mr. Ware, we'll give you a couple minutes for rebuttal. Thank you, Your Honor. Mr. Scherr? Good morning. May it please the Court. I'd like to address three issues from my colleagues' presentations. The deemed lawful provision first, the bill and keep regulations and damages. First, with respect... Could you first begin with the issue we were just talking about, which is where in the transition rules, pricing rules, did the Commission even impose a cap on interstate rates? Why don't you start there. Your Honor, we're relying on the cap that the Commission established in the transformation order itself. In the preamble? In paragraphs 800 and 801 of the transformation order the Commission announced, we are hereby capping all interstate switched access rates for all LECs going forward. As we argue in our brief, that's a legislative rule. That's all in the preamble, right? It's in the text of the transformation order. I thought those paragraphs were in the preamble. Am I wrong about that? It's in paragraphs 800 and 801 of the transformation order. I'm not sure if I understand your question about a preamble. Even if you're right that we can rely on the preamble language, I don't think we can when the regulation is clear as it is here. The regulation itself does not mention interstate rates. It's a little hard to incorporate that into clear regulatory language based on preamble language, isn't it? Your Honor, as Mr. Guerra mentioned, there is a note to section 51901 that references the chart that appears in the transformation order. But the fact that the rate cap doesn't appear in the Commission's codified rules doesn't prevent a clear statement that's binding in the transformation order itself from being a legislative rule. Do you have a case that you can cite? Yes, I'm just looking for a cite in our brief. All right. Bear with me one more second here. On page 30 of our brief, Your Honor, National Mining Association v. McCarthy, an agency action that purports to impose legally binding obligations or prohibitions on regulated parties and that would be the basis for an enforcement action for violations of those obligations or requirements is a legislative rule. Mr. Scherer, here's my problem. In the neighboring rules for ILEX, it's clearly stated. They clearly have interstate rate caps. And the best you can come up with on the SELEX is language in the preamble, which I think as Judge Tatel has suggested, we've got case law on that. And then this reference, which isn't a model of clarity. And it's so clear in the neighboring rules for the ILEX. That seems to be, to me, it's either an intentional omission in the SELEX rules or maybe it's a drafting error. But it's not there clearly the way it is in the ILEX. Why is that? I'm not sure, Your Honor. I think that the commission believes that. You agree with me that it's certainly not as clear as it is expressly stated in the rules for the ILEX. Right. And one of the situations you have here is that Orion is not an incumbent LEX, so it doesn't fall under those rules. And with respect to competitive LEX, the commission basically relied on benchmarking rules, generally, to bring competitive LEX into the bill and keep transition. But I think that the commission believed that it was being universal and comprehensive when it spoke in the transformation order itself. Okay. If we disagreed with you and thought that the SELEX rule contains no interstate rate cap, why should we reach the damages issues? Well, Your Honor, if you disagree on that point, then there is still the intrastate rate violation. The commission found that there was a violation of the provisions of 51911A and B. And I think that I agree with Mr. Guerra that if you were to conclude that the 2011 rate cap that the commission said that it adopted in the transformation order was not, in fact, applicable, then there would still be an issue as to whether the 2013 rate that Orion filed violated the benchmark rule, which went into effect beginning July 2013, which clearly applies to interstate rates. That's an open issue. That hasn't been adjudicated yet one way or the other. That's correct, Your Honor. So we would remand for damages determination on that? I mean, liability and damages determination on that? Is that your view? Once again, if we disagreed with you on the point about the interstate rate caps for SELEX. Yes, I believe so. Okay. Thank you. That's helpful. Going back to the deemed lawful provision, this case presents for the first time the question of whether a rate that violates a prescribed cap when filed can be deemed lawful. And the FCC's answer makes sense in terms of the statutory language, context, and purpose. Now, the language has to be read in light of the common law that's set forth in Arizona grocery. And the FCC did so reasoning that a rate that was not legal or lawful when it was filed because it exceeded a prescribed cap could not be deemed lawful. Why didn't the FCC challenge this within 15 days of filing? I mean, I presume there's some sort of review within that period, right? There is a pretty effective tariff review process, Your Honor. So why wasn't this one challenged? This one slipped through the cracks. The fact is that the tariff process isn't perfect. The commission pointed out in one of the orders on review that it receives thousands of annual tariff filings. And as a practical matter, it's not able to review as carefully as it perhaps should or can every single tariff filing. And so some of the filings slipped through the cracks. And as Mr. Guerra was explaining, the question here is whether to interpret the statute to immunize carriers from refund liability in the event that they file a patently illegal tariff that nevertheless slips through the cracks. And we believe that. In every single case where the deemed lawful provision could apply, it will always be the case that ex post, once you figure out the specific rate under review, that that rate will have violated some preexisting source of law, whether it be statutory prohibition on unjust and reasonable rates or some regulation implementing that prohibition. I think that's correct, Your Honor. The situation can't be. So the dispositive, the objection you're asserting can't simply be, Oh, well that filing was illegal at the time it was filed. The situation here that makes it unique is that when the tariff, when the rate is filed, it plainly violates a cap that was in existence before. And the, the Arizona under common law, legality and lawfulness were, were to think things with respect to rates. This court discussed that in ACS, the Arizona grocery case holds that with respect to a situation like this, where you have a rate cap, the agency prescribes a rate in advance. There can be no difference between people and the lawful rate. The, the, a rate that's filed that exceed a prescribed rate is, is a nullity. It's void ab initio. And so that's the situation. I think as Mr. Guerra was explaining what Congress changed drastically in adopting the deemed lawful provision was a situation where a carrier files a legal rate that later turns out to be unlawful because of development. Because of what? Well, for instance, because someone figures out how just and reasonable requirement applies in a case where it's unclear. And it was unclear in our two cases because we had rate of return carriers. And that apparently is a very complicated thing to figure out. Well, it's not that it's complicated to figure out so much that rate of return, when you, when you a rate of return, let's say the commission has a regulation that says you can not have more than earn more than 11.25% rate of return. You develop rates in order to achieve that rate of return, but then whether you go below it or above it depends on numerous variables like customer demand. So it used to be that if a carrier at the, and you would only know this at the end of the two year period, if a carrier earned more than the limit on the rate of return, let's say due to increased customer demand. And I think there was a case, this court involving the Virgin islands telephone company where there was a hurricane and there was a tremendous amount of demand. And as a result, there were over earnings. The sec could claw back those over earnings after the period. Now there was no way, absolutely no way of saying when that rate was filed and that rate of return was filed, that it was unlawful. It was, and it was clearly legal to all intents and purposes. And Congress set out to change that. And it did change that, but this is a completely different situation where in advance you know that the rate is illegal and unlawful. And the commission is reading the statute to, to bar deemed lawful status for, for those kinds of filings specifically. We think that the interpretation not only makes sense, which, but the context of the statute because the interpretation preserves FCC rate-making authority. And that would simply be undermined if tariff filers were free to ignore caps that the commission established in advance. And we certainly think the FCC's interpretation is consistent with Congress's purpose here, which was to provide certainty to carriers who, who filed rates that are legal from the outset that those rates will not be later deemed later be found unlawful. Should they file the, the streamlined tariff filings to the court, we believe should affirm the agency's interpretation of deemed lawful. Now turning to bill and keep regulations. I think as the court recognized the, the bill and keep regulations are comprehensive in scope. They apply to all local exchange carriers. Orient is not exempt as an intermediate carrier. It's not unique in being subject to cost-based rate-making and to rate caps. And it's contrary arguments rest on a historical distinction. That's really not meaningful anymore in the context of access charge reform. And finally, turning to damages, the FCC has strict statutory deadlines and proceedings like this one. So complainants must plead all matters fully and with specificity. AT&T thought damages based on the just and reasonable rate that Orient should have charged instead of its 2013 rate. And the FCC found that Orient's 2012 rate was conclusively presumed to be that just and reasonable rate. Now at the end of the liability phase, AT&T argued the presumption should be reversed, but the FCC correctly concluded that it was too late. The determination that Orient is liable for charging a rate other than the deemed lawful rate belongs to the liability phase and couldn't be deferred to the damages phase. Judge Tatel. I want to ask you about the commission's decision to defer AT&T's Section 201B claim. It just seems to me that that action is completely inconsistent with what we said in AT&T Corporation v. FCC,  when presented with AT&T's complaint, the commission had an obligation to answer the question it raised and to decide whether the carrier had violated the statute, period. Your Honor, in our brief, we cite to a subsequent decision by this court in a different AT&T case where this court declined to apply that precedent, where there was no indication, based on the court's review of the record, of the same kind of, quote, unquote, administrative shell game that the court believed the FCC had been engaging in, in the 92 case, when it deferred the 201B complaint to a future rulemaking proceeding. Now, here, what you had were two parallel complaint proceedings. AT&T was party to both proceedings. And you had the same fundamental issue presented in both proceedings. And what the commission said was the gravamen of the claim involves a third party, one of Orian's participating lex, and AT&T's right to interconnect directly with that third party. So because that party was a party to the other complaint proceeding, the FCC believed that the more efficient way to address that issue was in the parallel complaint proceeding. So I think if you compare this case and what the commission did in this case to the previous case, they're simply not comparable. Here it's a parallel complaint proceeding involving the party that's the subject of the complaint. And they were simply deferring to a future rulemaking proceeding, which was much more tentative and unsure. The parties in the two actions here are different, right? One involves AT&T's complaint against Orian, and the other involves their complaint against, I've forgotten the name, but the subtending LEC that's the notorious access stimulator. Correct. So you would presumably have different damages. You would have different legal issues since the whole question here arises only if AT&T has lost on its primary contention that LEC is itself an Now the question would be, well, can they nonetheless be roped in through an unreasonable practice? Not clear at all how that would arise in a case against the subtending LEC, which has the direct contract with the conference call service, or whatever it is. So it doesn't seem like, even if you had the discretion, it doesn't seem like this is a reasonable exercise of it. What the commission said was we think that the essence of this particular complaint is AT&T's right to avoid the Orian CEA network and interconnect directly with this subtending LEC. I think it was Great Lakes. And AT&T's contention was that the identity of the competing incumbent LEC and the nature of the services that it provided gave it a right to a different transport rate as to this subtending LEC and a right to And the commission just concluded that the substance of the two claims was the same. I think the language in the order on review is that this is really about Great Lakes, not Orian. And so we think that it's appropriately all fair. Judge Griffith, any other questions? No, I don't. Mr. Scherer, I think you may have a minute or two left. Thank you, Your Honor. Now you don't. All right, well, thank you. Let's see. I think neither counsel had any time left. Am I right? Correct. Okay. So you can each take two minutes if you would like. Okay. Thank you, Your Honor. This is James Troop. Just to follow up the argument that Orian made that the rate ceilings do not comply with 205's requirement that a rate prescription be just and reasonable, we're set forth in this initial brief starting on page 16 and in this reply brief starting on page 11. The FCC relies greatly on Arizona grocery. It's notable that it does not argue that there's been any forbearance. And the case law is clear that mandatory de-tariffing, even permissive de-tariffing or retroactive voiding of a filed and effective tariff rate is not permitted under the statute like they did in this case if there's been no forbearance. Instead, the FCC argues that the rate is not legal. In Arizona grocery, there's two factors were specified for when a rate is legal is whether it was filed and whether it was published. And both of those things happened in this case. The rate was filed, reviewed, and accepted by the FCC. It was published on the FCC's website and in a public notice. Orian provided a statutory required notice for its 2013 rate. Neither AT&T nor any other carrier challenged the rate before it became effective. After reviewing the 2013 tariff rate, the FCC decided to not suspend or investigate the rate amendment. The rate became effective and deemed lawful on July 2, 2013, and was charged to customers for four years before the rate was retroactively voided. The rate ceilings, whether it be the rate ceiling 51-905, which does not actually exist, the interstate rate ceiling there, which supposedly, as Orian violated, does not exist, or whether you talk about the 51-911C rate benchmark, neither are just and reasonable because neither has the FCC allowed Orian to charge. If it's just and reasonable, Orian should be able to charge it. In its reply on reconsideration of the referral order, Orian indicated that the rate ceiling is just and reasonable under 201 and 205, and the FCC must allow Orian to bill it. And that was rejected in the first tariff order. Thank you, Your Honor. Thank you. Mr. Guerra? Mr. Guerra? Yes, Your Honor. Two quick points. On the deemed lawful provision, Judge Katsas, I think the key distinction between the just and reasonable language of prescriptions under Section 205A is that Section 205A says that when there's a rate prescription, it is to be thereafter observed. And if you conclude that a carrier can just file a rate that's been prescribed under that provision and it can take deemed lawful effect, then I think that effectively nullifies that plain language in the 205A provision. And also, as I said earlier, the point of having the FCC suspend and conduct the hearing doesn't make sense with respect to already prohibited rates because there's no reason to conduct a hearing in that circumstance. There's already been a hearing and a conclusion that the rate's unlawful. And the fact that that just confirms that Congress was focusing on rates that could be just and reasonable after a lengthy set of factors like those that Mr. Scherr was identifying. With respect to the existence of the interstate rate cap, I would just make two points. I know Your Honor has alluded to your cases, but I would just make the plain language pitch under the APA that a rule is defined as the whole or part of any agency statement of general or particular applicability and future effect. And then I'm elapsing here and says including the approval or prescription for the future of rates. And so that is, I think, manifestly what the FCC did in paragraphs 800 and 801 in its transformation order. And for the reasons that they and we both have said, we think that ought to be treated as an effective rate prescription. And the other observation I'd make again is that there isn't a reference to the charts on those pages in 51.901. And so if the court is going to be saying that only things that show up in the CFR constitute rules and rate prescriptions, then I think the court ought to take the view that a cross-reference to a part of an order should be treated as part of the CFR itself. Thank you, Your Honors. Thank you, gentlemen, for your oral arguments and for adjusting so nicely to our new remote audio lives here. We'll take the case under submission.
judges: Tatel, Griffith, Katsas